0157183. Each side has 20 minutes. Ready to go? Yes, sir. Good morning. Good morning, Yanis. Good morning. My name is Emmanuel Akudinobi, and I represent the Plaintiff Appellants in this case. Yanis, at this time I would like to reserve five minutes of my time for rebuttal. Sure. The case at bench is a very simple case. And the simplicity of the case lies in the acts that was done or committed by the members of the Los Angeles Sheriff's Department on September 10, 1999. I know there are numerous issues on appeal, but I'm going to focus primarily on the issue of the knock-and-announce requirement as set forth in U.S.C. Section 30109. That's a federal statute, right? Yes, Yanis. And these are local law enforcement officers? Yes, Yanis. Does that statute apply here? Definitely, Yanis. The statute in question has to do with a need for law enforcement officers to knock-and-announce their presence prior to execution of a search warrant. And because of the nature of the case at bar, it's a 1983 action that implies the Fourth Amendment. And our courts have incorporated the statutory provision of 18 U.S.C. Section 30109. And the key issue here is whether or not on September 10, 1999, the sheriffs complied with the knock-and-announce provisions. Well, does the statute really go any further than the Constitution? I beg your pardon, Yanis? Does the statute really go any further than the Constitution? Knock-and-announce is required by the Constitution. I'll briefly touch on the text of the statute itself for clarity. The statute specifically provides that an officer can break open any outer or inner door or window of a house, or any part of a house, or anything nearing to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance, or if he is found guilty. Now, the facts of this case are that the statute provides that an officer can break open any outer or inner door or window of a house, or any part of a house, or anything nearing to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance, or if he is found guilty. And that differs from the Constitution in what way? I beg your pardon, Yanis? That differs from what the Constitution requires in what way. That is true. The Fourth Amendment provides that before searches or seizures are conducted, they must be based on article-level facts, showing that the person to be searched and the thing to be searched are where they are. The two are different, but for purposes of analysis, the provisions of 18 U.S.C. Section 3109 has been incorporated into the Fourth Amendment inquiry, because in most such an inquiry, the person to be searched and the thing to be searched are where they are. And that is the basis. That is the connection between the two, Yanis. Now, I'm going back to my argument. On September 10th, there is no dispute that the officers arrived at the location, that when they arrived at the location, they pried open the outer screen door of the steel's residence. In the process of prying open that outer steel door, Mr. Steele, who was already awake, lying on his couch, heard the noise. He went out to investigate. While he was at the door, he had officers announce their presence. Police. He told them there and then, hold up, I'm getting the door. As he was in the process of opening the door, the officers, contrary to the express provisions of 18 U.S.C. Section 3109, did not wait for him to refuse admittance before they battered in the door and, in the process, injured him. The most important thing at stake here is whether or not the officers complied with that express provision of the statute. Did they wait for Mr. Steele to refuse admittance before using force to break down his door? And as we've been told repeatedly by this Court, and more recently in a United States State Voter's Association hearing, the statute does not say you have to wait for the person to open the front door. The statute does not say you have to wait for the person to open the front door. The statute did not say you have to wait, but it does say you have to refuse admittance. And it's very illustrative when we look at the most recent opinion of the United States Supreme Court. In United States v. Banks, where the court unequivocally said that absent exigency, the police must knock and receive an actual refusal or wait out the time necessary to infer one before using force. The facts of this case shows that there was no exigency that arose from the time the officers left their police station to the time they decided to open the front door. They decided to batter down Mr. Steele's door. Now, the law provides for three circumstances wherein a door can be knocked down without waiting. Well, are you saying, though, that exigency couldn't come about from the facts of the situation that occurred at the door? No, Your Honor, based on the facts on the record. Well, no, we have to take this record, but you're saying that there was no exigency from when they left the police station until when they got there. Obviously, whatever the facts are and all inferences in your favor, it has to be considered what happened at the door, too, plus everything that is known at that time about the circumstances of the crime, what they were looking for, all of those things, right? That is true, Your Honor. The Supreme Court has said that whether a failure to abide by the knock-and-announce is valid is based on the totality of the evidence. And when you apply the totality of the evidence analysis to the facts of this case, there is no exigency that arose. For instance, in the United States v. Patterson, there was an issue of danger to reaction. The person in question was armed, and there were drugs involved. And these are some of the issues that the courts have looked at when you dispense with a knock-and-announce requirement. Here, there is no danger creation. Nobody in the Steeles family has a violent criminal history. There is no drugs involved, which was the basis for the United States Supreme Court in finding in U.S. v. Banks. But they have evidence that gang people hang out there, that Roderick is a gang person, and they're concerned. In fact, they told me on the warrant, they suggest, they're concerned about gang people letting other people know. If they're given time, they're trying to do coordinated warrants at a number of different places, and they're concerned that if they give very much time, Roderick or somebody is going to get on the line and call the other places or call their friends so they can hide evidence. And they're also concerned that Roderick is a gang member, and there have been two murders, and the murderers have hung out at this house, directly after the murders, apparently, and the gang members hang out there a lot at that house. That's what their evidence is, and they're concerned, and that's why they asked the trial court to be able to serve the magistrate, to be able to serve this thing in the early morning hours, when it's still dark, and they're worried about that. And the question is, do they have a reasonable suspicion that it might be dangerous or futile? Isn't that the question? Well, that's part of the issue, but that is not dispositive of the issue at stake. Well, it's not a dispositive issue you're stating, maybe, but what is dispositive is whether they had a reasonable suspicion that knocking and announcing and waiting any longer than they did would be dangerous or allow the hiding of evidence or, as they said, allow Roderick to pick up a phone and start calling his friends. Isn't that right? That's what they're claiming, but, Your Honor, when we take it in seriatim, one, the evidence, what is the evidence involved here? No evidence involved in this case is capable of being qualified as an evanescent evidence. There's no drugs involved. There was two murders, no doubt, but are you telling me that somebody can flush down a gun just the same way they can flush down a drug? I don't think that is the case. It's not a question of flushing guns. It's flushing people. He can get on a telephone and call people, or he can flush down his gang notes, or he can get rid of the pictures that show that he's a gang member. Lots of things can happen. It doesn't have to be flushing drugs down toilets. That is fine, Your Honor. True. He can put it in the shredder. He can put it in the garbage disposal, turn on the garbage disposal. Lots of things can happen. But that is not a critical reason why they over at the steel residence. Your Honor, I need to draw the court's attention to a particular notation that the people, the sheriffs made, that part of the reason why they went to the steel residence was to exclude Roderick from suspicion as a person who actually ratted. That's true. They told the magistrate, there's an additional advantage in our doing this that will help keep Roderick from being considered a rat fink. But that's not the reason they said they were going to do it. They said they wanted to go there because they thought there were guns, gang paraphernalia, and such is what they told the magistrate. Is that not true? That is what was included in the search warrant. When we are looking at the requirements of the law and how the courts have analyzed these cases, the only time you dispense with a lock and unmask requirement is when there is an evidence. Can you be concerned that someone would get a gun? I mean, obviously they're looking for guns, and my understanding is that the murders were committed by guns, correct? With guns. And that people, the alleged murderers, as it were, were there shortly thereafter. I mean, part of the exigent circumstance formula can be that you don't want to wait for people in the house to get a gun to use against the police, right? Allegedly is an interesting way of saying if you're in front of a jury or if you're in front of a trier of fact, was that really the fact? But that's not how we decide probable cause or reasonable suspicions, et cetera. That's not how we decide that. The question is whether a reasonable person knowing all the evidence, for example, that Roderick was actually with the other guy. What's his name? Yeah, he's actually with Hartfield at the time they commit a burglary earlier on. Hartfield said, well, Roderick's a gang member. Sure he's a gang member. They even have his moniker. They've got a gang file on him at the police station, apparently. So there's not too much question. I mean, you can question it, but we're talking about probable cause and we're talking about reasonable suspicion. We're not talking about whether as a matter of fact in the real world that's true. Isn't that right? That is right, but there's one key thing about the issue of exigency. They need a hobby prior to getting there. But notwithstanding that, they still need to comply with a knock and a knock. They need to be refused admittance. I want to cut you off, but I don't want to. And I don't want to cut my colleagues off for questions on this. But I need to ask you a couple of questions about when they're in the house and the two individuals that are handcuffed for two hours. I wanted to ask you, what is the evidence in your favor in terms of during that two hours that they were denied use of the bathroom and the older gentleman, his heart medication? The evidence is based on the declarations in support of the motion. Okay, but just tell me in the declaration specifically. I know that the police dispute that, that they just say they were handcuffed for two hours while they were doing the search or whatever. But in terms of your evidence that was admissible in the declaration was, I asked for my heart medication and I was told no, or tell me specifically what in the bathroom what was. Obviously, not being able to go to the bathroom is not as important as not being able to get your heart medication. But I want to know specifically, what was the evidence in the record in terms of, did he say when he said it and how long it? No, that one is not in the record, Your Honor. So what is in the record on that point? The only thing that is in the record is the declaration of Ms. Phil that she requested to use the restroom and their dad requested to have an opportunity to take his heart medication, but he was refused. Now, with regards to the specific time when that request was made, it's not in their declarations. So we really don't know how long she was denied access to the bathroom? No, it doesn't say that. What it says is, for three hours I was not allowed to leave the living room. And the next sentence says, on two separate occasions I requested to use the bathroom, but they wouldn't let me leave the living room. But it doesn't say if this thing was a three-hour episode. It doesn't say whether she asked two hours and 55 minutes into the event or at the beginning of the event or when she asked to use the bathroom. We don't know if she was actually denied access to the bathroom for five minutes or for three hours. Is that right? Sorry, Your Honor. The only thing I have is what's on the record, the number of times she requested and the fact that her father requested. And one other thing the court has to take into consideration. Is there anything in the record about his showing symptoms of heart palpitation or something like that? Well, yeah, that he said I told them I was faint or I told them this. He just said I asked to take my heart medication. And that's in her declaration? There's nothing in any of your declarations of Mr. Steele being in distress that calls for his heart medication. But this is a medication that he takes at a set time. Okay, but it doesn't say he takes it at a set time, though. His affidavit doesn't say I have to take it at 8 o'clock and I couldn't take it at 8 o'clock. I understand, Your Honor, but the fact remains that most people who take heart medications normally have a set routine. That's it, they take it at. Beyond that, I don't see the basis for the allegation that he was denied the opportunity to take the heart medication. You mentioned at the beginning you wanted to reserve some time. You have about three minutes left. Did you want to reserve that or do you want to use it up now? I'll reserve it at the end. Thank you very much. Good morning. Good morning, Your Honor. Before you go into the door coming in, so I don't have to interrupt you as I had to interrupt Mr. Okonobe, what evidence, giving all inferences in favor of the plaintiff's position, was there about this period when people were handcuffed and request to go to the bathroom? I mean, have we stated it here correctly or was there anything else in the record? As far as I recall, I think counsel has summarized it correctly. There's just this statement. It happened, but there's no indication, as the court has observed, no indication of how far into this 90-minute to three-hour period. Well, obviously, there would be some. I know that your contention is that that's not a problem here, but obviously there would be some situation perhaps, say, with someone that needs medication that you would have to concede that if the police continue to allow that, keep that person handcuffed when they were in some sort of medical distress or if they said something, if I don't take my medication right now, you know, I have to take it right now, I'm going to have a heart attack or I'm going to do this, and if the police were completely indifferent to that situation, that would have to be adequate to go to trial on. Sure, of course. How do you characterize this situation relative to, you know, I'm stating it at an end where we would all agree, and how do you characterize the facts most favorable to the plaintiff here regarding that? I just think they're inadequate to overturn the district court's ruling. I don't think... Well, we do it to no-go anyway, so, I mean, we have to look at it that way. The evidence that's before you, I don't think in those declarations, is adequate to allow you to say that the police acted unreasonably because this request was made at a certain time or under extremis or something like that. I think it leaves too many questions to allow the court to come to the conclusion that the police officers acted unreasonably here. There's nothing to indicate that the heart medication was a necessity right now. Why so? You know, what troubles me is we're talking about the timeline, and that's for using the bathroom and for the medication, right? And you have to say, well, they didn't say when they asked. But I suppose if, say, 15 or 20 minutes into the thing, I said, you know, I really have to use the bathroom. And then since Veronica asked twice and then maybe a few minutes later, she says, you know, I need to use the bathroom. It probably wouldn't take a rocket scientist to figure it hadn't just gone away in the next 30 minutes, hour, et cetera. The person still needs to use the bathroom. The same with the medication, isn't it? Suppose he said 15 minutes into this thing, you know, I really need to take my heart medication. The police figure he didn't need to take it because now it's gone on another 30, 40 minutes or another hour. I think if there were evidence of that, there'd be tribal issue. I just don't think there's evidence. He said, I asked to take my heart medication and they said, no, you can't take your heart medication. So let's say they said that 30 minutes into the thing. I don't know, 10 minutes into the thing. Pick your time. I don't care what the time is. But they just say, no, you can't take your heart medication. So you have to ask again. Do you have to fall on the ground writhing? I mean, what does he have to do? He wants to take his heart medication and they're just sort of arbitrarily saying, no, you can't take it. Isn't that slightly unreasonable? Well, I think at the very least, Your Honor, what he would have to do is allege when that denial was made and what effect it would have on his situation. I mean, he hasn't alleged, for example, that this is necessary that I take it at a given time. He hasn't alleged what would happen if I don't get my medication and, in fact, I did suffer this injury or this damage. He hasn't alleged any of those things. What happens if a person doesn't take their meds on time? I mean, a lot of times nothing happens right then. Nothing happens for a day maybe. I guess they have no damages, Your Honor. Well, we're not talking damages. We're talking about whether there's been a constitutional violation. Who cares if there are damages? If there was a constitutional violation, the damages are a dollar, right? True? Yes. Okay. So we don't care about damages. So he says and she says, we asked to use the bathroom. And they said, no, you can't use the bathroom. Do I have to ask again? How many times do I have to ask? Well, I'm not suggesting you have to ask repeatedly. But I'm suggesting that there needs to be some evidence of record as to when that occurred and what kind of deprivation that resulted into. Well, that's my question. If it happens at the end of two hours. I mean, when you say when, do you like it better if it happens at the end of the two hours or at the beginning of the two hours? Which do you like better? Well, as Judge Fernandez indicated, if this happened two hours and 55 minutes into the incident and five minutes later the police leave and they're released, they've been deprived of this for five minutes, that's less time than waiting for the next commercial. No big deal. Okay. So suppose it happened at the beginning. It's a more serious issue. Okay. So the earlier it happened, the worse it is. Is that right? Sure. Of course. I mean, the longer the person is deprived of reasonable accommodation, the worse it would be, except if it's asked early on, the police would have greater justification in forestalling that until they've been able to search the bathroom and make sure there's no guns or anything else in there that they don't want these people to get access to. Yeah. I agree with you that they didn't specify what time this happened. We don't know if they had to wait three hours to use the bathroom or three minutes to use the bathroom. But if we draw the inferences in favor of them, I mean, if we construe this in the light most favorable to them, how would you interpret for about three hours I was not allowed to leave the living room on two separate occasions, I asked to use the bathroom, if we're going to take it in the light most favorable to them? Well, I think that's as far as you can take it. I mean, I don't think you can make up evidence to help them out. Can we interpret that to mean they had to wait three hours to use the bathroom? I don't think so. I don't think that's an evidence. I don't think you can anymore draw that inference than it was two hours and 59 minutes later. I think we're limited to reviewing the evidence that they've produced. They haven't produced evidence of that. Let me ask you about what happened to Roderick. The officers took him from his home down to the police station. Yes, Your Honor. How long was he there? I think he was gone from the home about four hours, including transportation to and from and the time at the station. And he wasn't charged with anything? No, Your Honor. What's the probable cause to arrest him and take him down there? Probable cause to believe that he was an accessory to the murders and probable cause to believe that he was an active street gang participant. Specifically what? I mean, what facts lead to that conclusion? Well, I think I listed maybe 18, 19 of them in the brief for the active street gang participation. There's all this evidence that he's associated with this street gang. He's a member of the gang, no doubt about that. They got his picture and his letters. There's evidence that he's furthered the felonious purposes of the gang by providing a place for them to meet and exchange information. What did he do to provide the place? He allowed them to come to his house and hang out right after the murders and talk about things while things were going on. Did he invite them over, send them an invitation, or call them up and say, come over, or what did he do to... We don't know that. But just looking from the standard of probable cause for the police officers... I mean, they were at his house, but I'm having a hard time putting my finger on what he did to invite them there, as opposed to they just showed up. They didn't know that. That knowledge wasn't a part of their probable cause calculus, but they did know that this happened and they did know that he was associated with this gang and they did know that he had been arrested in a previous burglary with one of the gang members. And by the time they'd finished the search, they did know that he had gang paraphernalia, letters from the prison from another gang member. You've convinced me he's a gang member. I'm not sure what evidence they had that he facilitated a crime. Well, the one thing was that he provided this hideout, holdup, whatever, a congregation area for them immediately after one of the street murders. That's what I'm saying. I'm not sure, and I don't think you've told me, what evidence that he voluntarily provided the house as a place to gather, as opposed to these people just came over unannounced, uninvited. What evidence did they have of that? Then I think you'd have to draw an inference that people just show up at somebody's house unannounced after a murder and stand around talking about it and no one calls the police and says, hey, there's murderers out here bragging about killing a guy down the street. He wasn't participating in the discussion, was he? No, Your Honor. He was in another part of the house? He was in the front room. They were on the front porch. But when we're just talking about probable cause, not proof beyond a reasonable doubt, I think the police also justified the strong suspicion he was involved in that, in addition to which, once they saw his active street gang participation, they knew he had been involved in a burglary, which is another of the target crimes with one of the other gang members, and they had double probable cause. What about guns? What did they find in the way of guns before he was taken to the station? I think they found both handguns and long guns in the house. They didn't know yet whether any of those had been involved in either of those two murders that they were actually investigating, five murders, but the two that were in the warrant. And it wasn't for some time until they did ballistics that they cleared those guns and said that they were not involved in the murders and returned them to the owners. But at the time, they know there's firearms there. They don't know if they might have been connected to one of the murders under investigation. Well, see, that would seem to me to give them a right to seize the gun. I don't see where that gives them the right to arrest Roderick. Well, it simply contributed to the probable cause to believe he might have been involved in secreting the guns that were used in the murder. The people come there straight after the murder. You know, if they found the murder weapon, I'm with you. But they didn't know at the time they seized it. Exactly. That's my point. That's my point. They don't know. But they knew that he had been involved in this burglary with Hartfield. That's one of the target crimes. And they had all this evidence of his involvement with this gang that was committing these murders out on the street. So I think they had probable cause to arrest him for active street gang participation twice over. As you read this, the case on appeal, is Roderick actually contesting that there was probable cause to arrest him after the search took place? Or is his issue on appeal essentially that he was arrested too soon? I think it's the latter, Your Honor. I think that their contention, though I don't have any support by the record, is that he was arrested immediately and taken away. Right. But I think the evidence is to the contrary. Okay. Thank you. If the Court has no other questions. I don't. I'm prepared to submit. Thank you. Thank you very much, Mr. Rutledge. Your Honor, so I just need to point out three critical issues. Mr. Hyatt was detained, not arrested, and was never prosecuted for burglary. For what? For burglary. Okay. With regards to providing a hideout, the kids in question were on their front porch. The full view of all passersby. None of them set foot inside the still living room. And there is no evidence on the record to even show that Roderick was in the living room when this alleged discussion took place. With regards to the guns at stake, all the guns that were seized were seized from Mr. Steele's bedroom. Some of which were securely locked in his closet. None of the guns was found in any other part of the house. This is a 69-year-old patriot who believes that the neighborhood that he has lived in for more than 30 years has decayed so much that he called the gang issues out there an equal opportunity invader. And when you look at that, you're looking at the sanctity of a man's home. Somebody who has lived in a neighborhood for more than 30 years doesn't have a criminal history. Nobody in his household as of the date in question had any criminal history. Other than the fact that Roderick was detained briefly in connection with a burglary, he was not arrested. Now, going back to the main issue that I was talking about earlier, which is the knock-and-announce prohibition of the law. Claims of exigent circumstances cannot be based on generalizations or stereotypes. This court so held in U.S. v. Granville, it's not enough to say that Roderick is a gangbanger and the kids have this tendency to allow other gangbangers to come into their house and hide guns. You must have a particularized something that you can point to for you to dispense with a knock-and-announce requirement. And that issue was not complied with here. There is nothing that they can show on the record that said, when we got here, this is what we saw. For instance, there have been instances where a spotter will see somebody. When the officers knock, the person opens the door. On seeing the officers, they run back. That's futility, because knocking and announcing is dispensed with. The case is not going to allow you. Or they see you, they slam the door on you. It didn't happen here. And I submit on that, Your Honor. Thank you. Thank you both, gentlemen. The case to start, you just submitted. Good morning.
judges: Fernandez,silverman,callahan